IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARC A. MANZO,<br>#42139-044,<br>PLAINTIFF,<br><br>v.<br><br>G. MATEWARE, ET AL.,<br>DEFENDANTS. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL CASE NO. 3:19-CV-812-S-BK |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b) and *Special Order 3*, this case was referred to the United States magistrate judge for pretrial management, including the issuance of findings and a recommended disposition where appropriate. The Court granted *pro se* Plaintiff Marc A. Manzo's motion to proceed *in forma pauperis* but did not issue process pending judicial screening. Doc. 9. Now the Court considers Manzo's claims against the two remaining Defendants in this case—Dr. Mateware and Nurse Bandas. Upon review, Manzo's official capacity claims are barred by sovereign immunity and his individual capacity claims are not authorized under *Bivens*. Accordingly, this action should be summarily **DISMISSED**.

**I. BACKGROUND**

On April 3, 2019, Manzo, a federal prisoner at FCI Seagoville in Texas, filed a *pro se* complaint for civil rights violations under 42 U.S.C. § 1983 against Missouri officers for failing to protect him from an inmate assault. Doc. 3 at 4-7. Manzo also sued FCI Seagoville Medical Director Dr. G. Mateware, Nurse K. Bandas, and Dr. Shao Le, under the Federal Tort Claims Act ("FTCA"), alleging negligent medical care for a detached retina, allegedly suffered as a result of

the Missouri inmate attack. Doc. 3 at 4-5, 8. Additionally, Manzo attempted to plead a claim alleging cruel and unusual punishment in violation of the Eighth Amendment. Doc. 3 at 2-3 (generally mentioning the Eighth Amendment and the deliberate indifference standard and asserting jurisdiction under *Bivens*[1] and 28 U.S.C. § 1343).

Subsequently, Manzo voluntarily moved to dismiss his FTCA claim and his claims against the Missouri officers and Dr. Lee, and the Court granted him leave to amend his *Bivens* claims against Dr. Mateware and Nurse Bandas. Doc. 15 at 2-4. However, finding that granting leave to amend to sue the United States, the U.S. Department of Justice, the Bureau of Prisons ("BOP"), and Warden Zook would be futile, the Court denied permission to amend to that extent.[2] Doc. 15 at 4-5.

In his second amended complaint (the operative complaint), Manzo sues Dr. Mateware and Nurse Bandas (collectively "Defendants"), in both their official and individual capacities, under *Bivens*. Doc. 16 at 1, 22; *see also* Doc. 18 at 2, 4 (answers to magistrate judge's questionnaire). Manzo complains Defendants were deliberately indifferent to a serious medical condition involving his left eye, in violation of the Eighth Amendment. Doc. 16 at 1. Specifically, Manzo alleges Defendants' denied and delayed treatment, which caused "irreversible damage to [his] retina" and partial loss of eyesight. Doc. 16 at 1, 7-8, 23. He also asserts Defendants' conduct amounted to negligence and medical malpractice, Doc. 16 at 1, and he seeks compensatory and punitive damages, Doc. 16 at 22.

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (authorizing a cause of action for damages against a federal officer who, acting under color of federal authority, allegedly violates the U.S. Constitution).
[2] The operative complaint nevertheless lists as defendants in its style and caption the United States, the Department of Justice, the BOP, and Warden Zook, Doc. 16 at 1, despite the Court's denial of leave to amend to assert claims against them, Doc. 15 at 4-5.

In his operative complaint, Manzo alleges that his eyesight began to fail in November 2017, six months after another inmate struck him in his left eye and head. Doc. 16 at 34, 43. On November 14, 2017, Manzo submitted his first request for an optometrist (1) to check his eyesight, which was necessary to obtain contact lenses, and (2) examine "vision anomalies" allegedly caused by the inmate assault. Doc. 16 at 7, 23, 34. On November 21, 2017, upon learning that he would be placed on a "waiting list," Manzo again requested an optometrist visit as soon as possible and clarified that "the vision in [his] left eye" was becoming worse and that he was "only able to see about ¾ of [his] field of vision[.]" Doc. 16 at 34. Still, no "face-to-face diagnosis" was scheduled for about a month. Doc. 16 at 7, 34.

Manzo subsequently went to sick call seeking medical attention. Doc. 16 at 42. On December 8, 2017, Nurse Bandas examined his eyes, without dilation, and while noting "low vision" in one eye, was not otherwise concerned that Manzo could not see the eye chart. Doc. 16 at 35, 42. Manzo states he was worried about his deteriorating sight and, on December 13, 2017, he "bypassed standard protocols" and "took it upon himself to meet with the visiting optometrist in order to receive a preliminary evaluation . . . through his viewing scope." Doc. 16 at 7. The optometrist found Manzo's condition "urgent," and within less than 24 hours, Manzo was seen by a retinal specialist who performed emergency surgery to re-attach Manzo's retina on December 18, 2017. Doc. 16 at 36, 37, 41.

Manzo further alleges that he was afraid the first surgery was unsuccessful since his eyesight continued to fade and again requested to see the specialist. Doc. 16 at 7. He claims the medical staff ignored his requests and delayed scheduling a follow-up visit. Doc. 16 at 7-8. On April 5, 2018, Manzo finally saw the specialist, who in turn scheduled a second emergency surgery to reattach his retina—performed on April 9, 2018—but warned the surgery likely would

not be successful due to the significant lapse of time. Doc. 16 at 8; Doc. 16 at 38; Doc. 16 at 43. After the second surgery, Manzo repeatedly and unsuccessfully requested a follow-up visit with either an outside specialist or the surgeon who performed the second surgery. Doc. 16 at 8.

## II. ANALYSIS

Because Manzo is proceeding *in forma pauperis*, his complaint is subject to screening under 28 U.S.C. § 1915(e)(2)(B). That statute provides for the *sua sponte* dismissal of a complaint if, *inter alia*, it fails to state a claim upon which relief may be granted or seeks monetary relief against a defendant who is immune from such relief. A complaint fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

The Court must always liberally construe pleadings filed by *pro se* litigants. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (*pro se* pleadings "must be held to less stringent standards than formal pleadings drafted by lawyers"); *Cf.* FED. R. CIV. P. 8(e) ("Pleadings must be construed so as to do justice."). Even under the most liberal construction, however, the operative complaint, as supplemented by Manzo's sworn answers to the *Magistrate Judge's Questionnaire*, fails to state a legally cognizable claim.

### A. Official Capacity Claims Are Barred

As Manzo seeks only monetary damages, his official-capacity claims against Defendants are barred by sovereign immunity since such claims are treated as alleged against their federal agency employer, the BOP. *See Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985) ("Official-capacity suits … 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (citations omitted)). Under the doctrine of sovereign immunity, the United States Government cannot be sued unless it gives its consent. *See Lehman v.*

4

*Nakshian*, 453 U.S. 156, 160 (1981) ("the United States, as sovereign, is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit" (quotations and citations omitted)); *F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 484-86 (1994) (federal agency cannot be sued under *Bivens*); *Pinson v. Fed. Bureau of Prisons*, 647 F. App'x 375, 376 (5th Cir. 2016) (BOP entitled to sovereign immunity).

### B. *Bivens* Does Not Extend to Permit the Individual Capacity Claims

The Supreme Court has developed a two-part test to determine if a *Bivens* claim may proceed. *Ziglar v. Abbasi*, — U.S. —, 137 S. Ct. 1843, 1843 (2017). As recounted by the Court of Appeals for the Fifth Circuit, because *Bivens* is a judicially crafted remedy rather than a statutory one like 42 U.S.C. § 1983, courts should consider (1) whether the case "presents a new context" and, if it does, (2) whether "there are any special factors that counsel hesitation about granting the extension." *Byrd v. Lamb*, 990 F.3d 879, 881 (5th Cir. 2021) (finding "the *Bivens* question is antecedent" to other issues in a case, including qualified immunity (internal quotations and citations omitted)); *Watkins v. Three Admin. Remedy Coordinators of Bureau of Prisons*, 998 F.3d 682, 684-85 (5th Cir. 2021) (raising the *Bivens* question *sua sponte* on appeal). The Supreme Court has also strongly counseled against extending *Bivens* to new contexts, *Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020), and repeatedly held that such extensions are "a 'disfavored' judicial activity." *Ziglar*, 137 S. Ct. at 1857; *see also Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020) ("Bivens was the product of an '*ancient regime*' that freely implied rights of action" and that "ended long ago.") (emphasis in original), *pet. for cert. filed*, No. 20-1060 (Feb. 3, 2021).

*1. Manzo's Medical Care Claims Present a New Context*

In analyzing "whether [a] case presents a new context, [the court] must determine whether [it] falls squarely into one of the established *Bivens* categories, or if it is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court." *Byrd v. Lamb,* 990 F.3d 879, 882 (5th Cir. 2021)*, petition for cert. filed* (Aug. 6, 2021) (cleaned up) (quoting *Oliva*, 973 F.3d at 442). The Supreme Court has extended *Bivens* claims to only those arising from three specific factual scenarios:

> (1) manacling the plaintiff in front of his family in his home and strip-searching him in violation of the Fourth Amendment, *see Bivens*, 403 U.S. at 389–90, 91 S. Ct. 1999; (2) discrimination on the basis of sex by a congressman against a staff person in violation of the Fifth Amendment, *see Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979); and (3) failure to provide medical attention to an asthmatic prisoner in federal custody in violation of the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980).

*Oliva*, 973 F.3d at 442. "Virtually everything else is a 'new context'" and the "understanding of a 'new context' is broad" . . . "because 'even a modest extension' of the *Bivens* trilogy 'is still an extension.'" *Id.* (citations omitted).

When examining whether a case differs significantly, courts may consider the Constitutional right in question, the statutory or other legal basis for the officer's actions, the rank of the officers involved, or the existence of latent special factors that prior *Bivens* cases did not contemplate. *Ziglar*, 137 S. Ct. at 1860. Moreover, "it is not enough even if 'a plaintiff asserts a violation of the same clause of the same amendment in the same way.'" *Oliva*, 973 F.3d at 442 (quoting *Cantu v. Moody*, 933 F.3d 414, 422 (5th Cir. 2019)).

The instant case differs significantly from the *Bivens* trilogy of actions sanctioned by the Supreme Court. Although Manzo premises his claims on a theory of deliberate indifference to a serious medical need under the Eighth Amendment, as did the plaintiff in *Carlson*, his claims are

6

meaningfully different.  In *Carlson*, the Supreme Court relied on *Bivens* to imply a cause of action for monetary damages for a prisoner's estate where the failure to treat the inmate's asthma led to his death.  *Carlson*, 446 U.S. at 24.  The lower court described the denial of medical treatment as "so clearly inadequate as to amount to a refusal to provide essential care, so inappropriate as to evidence intentional maltreatment causing death." *Green v. Carlson*, 581 F.2d 669, 675 (7th Cir. 1978), *aff'd*, 446 U.S. 14 (1980).  The prisoner in *Carlson* had been diagnosed as a chronic asthmatic when he entered the federal prison system. *Id.* at 671.  Three years later, his condition required hospitalization for eight days at a hospital outside the federal penitentiary where he was confined.  *Id.*  When he was returned to prison, however, he was denied the medication and steroid treatments ordered by the hospital physician.  *Id.*

Whether *Carlson* can be construed as extending Bivens to *all* claims of medical indifference is an open question.  Some district courts have expressed a willingness to extend *Bivens* to other medical care claims, while others have concluded that different medical assertions present a new context from *Carlson* and have declined to extend *Bivens*.  *See e.g. Soria v. Zungia* , 2020 WL 8483841, at *4-5 (E.D. Ca. Dec. 2, 2020) (collecting cases).  In a post-*Ziglar Bivens* action by a federal prisoner, complaining of denial of medical care for an injured ankle, the Court of Appeals for the Fifth Circuit Court observed: "[I]f we were to address whether *Bivens* extends to [the prison] context . . . [the plaintiff's] deliberate-indifference claims based on denied medical treatment are likely a 'new [*Bivens*] context' because they 'differ in a meaningful way' from existing *Bivens* claims." *Petzold v. Rostollan*, 946 F.3d 242, 248 n.21 (5th Cir. 2019).  The appellate court emphasized that "the federal officers involved were low level, the specific actions distinct, and the alternative remedial process robust." *Id.*; *but see Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) (assuming a *Bivens* remedy for a

7

deliberate-indifference claim based on high-level prison officials failing to heed doctor's orders). The Court also stated that it was "unlikely to imply a *Bivens* remedy for this new context as 'special factors' counsel hesitation in federal prison administration." *Petzold*, 946 F.3d at 242 n.21; *see also Minneci v. Pollard*, 565 U.S. 118, 121 (2012) (declining to imply *Bivens* remedy for medical care claim against privately operated prison despite Eighth Amendment's applicability).

The same logic applies to Manzo's claims as in *Petzold*. First, the medical conduct at issue in this case differs markedly from the one in *Carlson*. Manzo alleges "irreversible damage to [his] retina" and partial loss of eyesight; he complains medical treatment was delayed and denied and the Defendants' conduct rose to negligence and medical malpractice. Doc. 16 at 1, 7-8, 23. Although the Court does not downplay Manzo's retina condition or eyesight loss, his overall injury is measurably less serious than that in *Carlson*, as he obviously does not allege a significant failure of the medical delivery system that led to the prisoner's death. Thus, Manzo's claims differ in both "type and severity" from *Carlson*. *See Martinez v. U.S. Bureau of Prisons*, No. 5:15-CV-2160, 2019 WL 5432052, at *10 (C.D. Cal. Aug. 20, 2019), *R. & R. adopted*, 2019 WL 5424414 (C.D. Cal. Oct. 22, 2019), *aff'd*, 830 F. App'x 234 (9th Cir. 2020) (finding deliberate indifference claims stemming from failure to treat hypertension due to BOP's policy was a new context). This "substantial difference in the factual context of the two cases is sufficient for this Court to conclude that the Eighth Amendment claim asserted here presents a new *Bivens* context." *Stanard v. Dy*, C19-1400, 2021 WL 1341082, at *6 (W.D. Wash. Mar. 10, 2021) (concluding denial of treatment for Hepatitis C due to a BOP policy presented a new context); *Dissler v. Zook*, 3:20-CV-00942-D (BT), 2021 WL 2598689, at *4 (N.D. Tex. May 7, 2021), *R. & R.* adopted, 2021 WL 2589706 (N.D. Tex. June 23, 2021) (same finding as to claim

8

of inadequate dental treatment claim); *Nabaya v. Bureau of Prisons*, No. 3:19-CV-215-L-BN, 2020 WL 7029909, at *4 (N.D. Tex. Oct. 7, 2020), *R. & R. adopted*, 2020 WL 7027470 (N.D. Tex. Nov. 30, 2020) (same as to inadequate periodontal care claim "vastly less serious" than in *Carlson*).³

Second, Nurse Bandas is a low-level prison nurse and, as explained more fully below, Manzo presents no facts reasonably suggesting that the supposed deliberate indifference was due to her individual actions. While Manzo also sues Dr. Mateware in his supervisory capacity as the Medical Director at FCI Seagoville, he offers no plausible facts establishing any link between his wrongful actions as a supervisor and the deliberate indifference at issue. Third, as in *Petzold*, the BOP's administrative remedies process is a robust alternative remedial scheme and other special factors, as addressed *infra*, counsel hesitation in the federal prison context. Further, even if Manzo's claims call for only a "modest extension" of *Carlson*, it is "still an extension" and the context is thus new. *See Oliva*, 973 F.3d at 442 (quoting *Ziglar*, 137 S. Ct. 1864).

In short, the Court finds that Manzo's Eighth Amendment deliberate indifference claims present a new *Bivens* context and a special factors inquiry is required.

   2. *Special Factors Counsel Against Extending Bivens to this New Context*

The special-factor analysis focuses on whether "the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed" against federal officers. *Ziglar*, 137 S. Ct. at 1857. Congress is

---

³ *See also Masias v. Hodges*, No. 5:20-CV-171, 2021 WL 1558329, at *6 (N.D.W. Va. Apr. 8, 2021) (same conclusion as to medical care claims that were not severe and not likely to cause permanent damage); *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 64, 65 (E.D.N.Y. 2017), *aff'd on other grounds*, 755 Fed. Appx. 67 (2d Cir. 2018) (same as to denial of dental hygiene supplies and shoes with adequate muscle support)

generally better suited than the courts to authorize a damages suit. *Id.*; *Watkins*, 2021 WL 2070612, at *3 ( holding that whether the judiciary is well-suited is [t]he 'most important' *Bivens* question" since Congress, not the courts, "should decide whether to provide for a damages remedy" in the prison context). The Prison Litigation Reform Act ("PLRA"), which governs lawsuits brought by prisoners, "'does not provide for a standalone damages remedy against federal jailers.'" *Watkins*, 2021 WL 2070612, at *3 (quoting *Ziglar*, 137 S. Ct. at 1865). "So out of respect for Congress and the longstanding principle of separation-of-powers, [the court] cannot imply such a remedy in [the federal prison context]." *Id.* (declining to imply a *Bivens* remedy for First amendment Retaliation claims against prison officials); s*ee also Callahan v. Federal Bureau of Prisons*, 965 F.3d 520, 524 (6th Cir. 2020) (opining that the PLRA suggests Congress does not want a damages remedy against federal jailers and this counsels against extending *Bivens)*.

Several other special factors also counsel against extending *Bivens* in the federal prison context. First, Manzo had access to two potential, alternative remedies, which militates against expansion of a *Bivens* remedy. *Ziglar*, 137 S. Ct. at 1863 ("[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not." (citations omitted)). Importantly, "the alternative relief necessary to limit *Bivens* need not provide the exact same kind of relief *Bivens* would," and the mere fact "[t]hat [it] might not give [the plaintiff] everything he seeks is . . . no reason to extend *Bivens*." *Oliva*, 973 F.3d at 444. *See also Schweiker v. Chilicky*, 487 U.S. 412, 421-22 (1988) ("The absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation."). "The relevant question 'is not what remedy the court should provide for a wrong that would otherwise go unredressed,' but instead, 'whether an elaborate

10

remedial system . . . should be augmented by the creation of a new judicial remedy.'" *Mack v. Yost*, 968 F.3d 311, 320 (3d Cir. 2020) (*quoting Bush v. Lucas*, 462 U.S. 367, 388 (1983)).

As a federal prisoner, Manzo had access to the BOP's administrative remedy program, which offered him an essential alternative path to raise his claims.[4] *Callahan*, 965 F.3d 520, 524. That process is "substantial." *Id.* It not only offers detailed filing and appeal procedures, including a statute of limitations, but also permits prisoners to retain an attorney for assistance. *Id*; *Malesko*, 534 U.S. 61, 74 (summarizing the BOP's administrative remedies process, through which prisoners "may seek formal review of an issue which relates to any aspect of their confinement"). The BOP must also investigate and respond to administrative-remedy-program grievances, 28 C.F.R. § 542.11, and through the administrative process "inmates can alert the BOP to unconstitutional officer conduct and policies and prevent such constitutional violations from recurring." *Mack v. Yost*, 968 F.3d 311, 321 (3d Cir. 2020). Federal prisoners can also bring official-capacity suits in federal court to obtain injunctive relief. *Malesko*, 534 U.S. at 74. At least three circuit courts have found that the BOP's administrative remedies process provides a substantial reason for refraining from providing a new monetary damages remedy. *See, e.g.*, *Mack*, 968 F.3d at 320–21; *Callahan*, 965 F.3d at 523-24; *Vega*, 881 F.3d at 1153.

The FTCA likewise provides Manzo a potential, alternative remedy. The FTCA waives the Government's sovereign immunity from tort claims that arise from the negligent or wrongful acts or omissions of federal employees in the course of their employment. 28 U.S.C. §§

---

[4] The fact that Manzo "was unsuccessful in obtaining relief through this program 'does not mean that he did not have access to alternative or meaningful remedies.'" *Mack v. Yost*, 968 F.3d 311, 321 (3d Cir. 2020) (quoting *Vega v. United States*, 881 F.3d 1146, 1155 (9th Cir. 2018)); *see also* Doc. 3 at 26-34 ( for copies of administrative remedies requests and BOP's responses).

1346(b)(1), 2679(b)(1). Instructively, the plaintiff in *Oliva* had fully exhausted his administrative remedies with the Veterans Administration ("VA") before suing the United States under the FTCA and the individual VA officers under *Bivens* for damages arising from a physical altercation that led to his arrest. *Oliva*, 973 F.3d at 444; 28 U.S.C. § 2680(h). The Fifth Circuit found that the FTCA was "an alternative remedial scheme for [the plaintiff's] claims" even if it did not cover his constitutional tort claim for excessive use of force under the Fourth Amendment. *Oliva*, 973 F.3d at 444.

Manzo, like the plaintiff in *Oliva*, sued Defendants under the FTCA but later voluntarily dismissed those claims because he had not exhausted his administrative remedies.[5] Doc. 15 at 1-3; Doc. 14 at 1 (conceding his FTCA claims were unexhausted). Manzo's decision not to avail himself of the FTCA does not negate the availability of the FTCA as a potential remedy in his case. *See Oliveras v. Basile*, 440 F. Supp. 3d 365, 374 (S.D.N.Y. 2020) (finding the FTCA was an alternative remedy and, thus, a special factor counseling hesitation, even though the FTCA's discretionary function exception barred the claims against the government and the plaintiff was left "essentially without a remedy"). Simply stated, it is "the overall comprehensiveness of the statutory scheme at issue, not the adequacy of the particular remedies afforded, that counsels judicial caution in implying *Bivens* actions." *Dotson v. Griesa*, 398 F.3d 156, 167 (2d Cir. 2005) (citing *Schweiker*, 487 U.S. 412, 421-22).

Another special factor instructive here is whether there are "other sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy in a suit like this one."

---

[5] The FTCA conditions the availability of a damages claim on the exhaustion of administrative remedies. *Oliva*, 973 F.3d at 444; 28 U.S.C. § 2675(a).

*Ziglar*, 137 S. Ct. at 1865.  "Prison-based claims . . . present a risk of interference with prison administration."  *Callahan*, 965 F.3d at 524.   The BOP, not the judiciary, is responsible for overseeing the operational needs of prison units.  Unquestionably, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources."  *Turner v. Safley*, 482 U.S. 78, 84-85 (1987).  And "[t]hose tasks fall 'peculiarly within the province of the legislative and executive branches.'"  *Callahan*, 965 F.3d at 524 (quoting *Turner*, 482 U.S. at 85).  Consequently, courts have deferred to prison officials' decision making and such wide-ranging deference cautions against creating a new remedy in this area.  *Mack*, 968 F.3d at 323; *Callahan*, 965 F.3d at 524.

> *3. Failure to State Plausible Constitutional Claims is an Additional Reason to Hesitate*

Notwithstanding the special factors discussed *supra*, there is another sound reason to exercise caution here.  Even accepting the allegations as true, Manzo fails to state plausible constitutional claims.  Thus, "the lack of merit of the claims … and whether to find a remedy merge to weigh against the creation of a *Bivens* remedy."  *Nabaya*, No. 3:19-CV-215-L-BN, 2020 WL 7029909, at *4 (cleaned up) (quoting *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 65 (E.D.N.Y. 2017), *aff'd*, 755 Fed. Appx. 67 (2d Cir. 2018)); *see also Oliveras*, 440 F. Supp. 3d at 373-75 (declining to extend *Bivens* for a claim that rested on "a shaky legal foundation").

Manzo's allegations lack the requisite factual enhancement from which it could be inferred that either Dr. Mateware or Nurse Bandas acted with deliberate indifference to a serious medical need, such that it constituted "unnecessary and wanton infliction of pain."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v.Georgia*, 428 U.S. 153, 173 (1976) (joint opinion)).  "[D]eliberate indifference is 'an  extremely high standard.'"  *Petzold v. Rostollan*, 946 F.3d 242, 248-49 (5th Cir. 2019) (citations omitted).

13

> The prisoner "must first prove objective exposure to a substantial risk of serious harm"—in other words, the prisoner must prove a serious medical need. Second, the prisoner must prove the officials' subjective knowledge of this substantial risk. Third, the prisoner must prove that the officials, despite their actual knowledge of the substantial risk, denied or delayed the prisoner's medical treatment. Finally, the prisoner must prove that the delay in or denial of medical treatment resulted in substantial harm, such as suffering additional pain. Importantly, "disagreement about the recommended medical treatment is generally not sufficient to show deliberate indifference."
>
> Supervising officials are liable for their own deliberate indifference but are not vicariously liable for their subordinates' conduct. A supervisor is deliberately indifferent if, with subjective knowledge of the substantial risk of serious harm, he or she fails to supervise a subordinate and this failure causes a prisoner's rights to be violated

*Id.* at 249. *See also Butts v. Martin*, 877 F.3d 571, 588 (5th Cir. 2017) (a *Bivens* action is analogous to a § 1983 action and as such share the same substantive standards). Even assuming a serious medical need, Manzo fails to allege facts that plausibly suggest Defendants' subjective knowledge of his substantial risk of serious harm.

### a. No Supervisory Liability as to Dr. Mateware

Dr. Mateware may not be held liable in his individual capacity under *Bivens* for supervisory liability. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) (holding that supervisory government employees are only liable for their own misconduct, and the theories of *respondeat superior* or vicarious liability do not provide a basis for liability). Rather, to impose liability against a supervisory official, the plaintiff must establish the defendant's (1) personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *See Turner v. Lieutenant Driver*, 848 F.3d 678, 695-96 (5th Cir. 2017). Manzo's allegations do not meet this standard, however.

Manzo asserts Dr. Mateware, as the medical director, had "final authorization on all ordered, prescribed, scheduled, or administered medical tests, procedures, outside diagnosis,

14

surgery, or denial thereof." Doc. 18 at 2. He contends Dr. Mateware had both "personal and professional responsibility [for] each patient care initiative, even upon issues in which Dr. Mateware may not have personally or individually engaged in, or met with a particular patient." Doc. 18 at 2. Manzo maintains that all medical decisions and treatments fell under Dr. Mateware's "purview and authority," and, consequently, he cannot "avoid liability" or "declare ignorance or unfamiliarity of ordered or neglected patient interaction." Doc. 18 at 2. Manzo's assertions fall short of alleging Dr. Mateware's personal conduct in the incidents complained of or that even suggesting a causal connection between his allegedly wrongful conduct as a supervisor and the deliberate indifference at issue.

Manzo contends his initial request for an optometrist was "summarily ignored by Dr. Mateware the entire Medical Department at FCI Seagoville" and "other healthcare professionals under [his] supervision." Doc. 18 at 2. Manzo also contends Dr. Mateware and his subordinates failed to schedule timely follow up visits and surgeries. Doc. 18 at 3. He proffers no facts reasonably attributing the supposed deliberate indifference to Dr. Mateware's individual actions and relies instead on supervisory liability, which again is simply insufficient. Doc. 18 at 3 (stating the "neglect" he endured "place[s] liability squarely upon Dr. Mateware *and others acting on his behalf*"(emphasis added)). *Cf. Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001) (discussing when the lack of training or supervision rises to deliberate indifference). Specifically, Manzo does not assert that Dr. Mateware ever saw him before or following his first surgery. Thus, even accepting as true his factual allegations, Manzo's individual-capacity claims against Dr. Mateware lack facial plausibility.

15

### b. *No Personal Involvement by Nurse Bandas*

"Personal involvement is an essential element of a civil rights cause of action" against a nonsupervisory official. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citation omitted); *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016). A defendant "must be either personally involved in the acts causing the deprivation of a person's constitutional rights, or there must be a causal connection between an act of the [defendant] and the constitutional violation sought to be redressed." *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983) (citation omitted).

Manzo asserts Nurse Bandas participated in the events at issue because she (1) served in a "gatekeeping" capacity, (2) was his primary point of contact in the Medical Department and "primary care giver," and (3) "acted under the authority of her immediate supervisor and medical director, Dr. Mateware," the Medical Department, and that even the Warden "entrusted such caregiver and procedural authority back to Nurse Bandas to act in her individual and … professional capacity with each patient she may represent." Doc. 18 at 4-5; *see also* Doc. 18 at 7. He avers that, after returning from the first surgery, he "notif[ied] the Medical Department staff, including Nurse Bandas," that the surgery likely was not successful and that the specialist had requested to see him for evaluation. Doc. 18 at 4. Manzo claims that Bandas ignored all his requests and that her "neglect" continued until April 5, 2018, when he was returned to the specialist and the second emergency surgery was performed. Doc. 18 at 4; Doc. 16 at 43. But again, apart from the first optometrist request, which was not addressed to Bandas, and Nurse Bandas' cursory eye examination of Manzo without dilation during the sick call visit, Doc. 16 at 34, Manzo recounts no other instance in which he sought care from Bandas directly. Doc. 18 at 4-5; Doc. 18 at 7 (reiterating "Plaintiff submitted a multitude of electronic Cop-Outs (inmate

16

requests), as well as paper request, and multiple visits to the Medical Department sick call roster where in-person requests may be scheduled").

Even accepting his factual allegations as true, Manzo fails to state a plausible claim against Nurse Bandas. Manzo alleges no facts from which it can plausibly be inferred that Nurse Bandas was personally involved in the events underlying Manzo's deliberate indifference claims. Apart from the December 8, 2017 cursory eye examination without dilation, Manzo does not allege that Nurse Bandas had personal knowledge of his detached condition before the first operation. Likewise, as previously concluded, he provides asserts no facts from which it can be inferred that she had actual knowledge of his post-surgery complaints. At best, Manzo presents only "threadbare recitals" that he submitted a large number of inmate requests, which the Medical Department ignored. Doc. 18 at 7. He attributes the neglect to Bandas because of her supposed "gatekeeping" and "primary care giver" capacity and implied "authority" to ask Dr. Mateware and other officials to schedule outside medical visits and procedures. Doc. 18 at 4-5, 7. *See Iqbal*, 556 U.S. at 679 ("The well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct."). Simply put, apart from his conclusory allegations, Manzo offers no facts reasonably suggesting that the supposed deliberate indifference was due to Bandas' individual actions. *Wells v. Collier*, 834 F. App'x 949, 950 (5th Cir. 2021) (per curiam) (finding conclusional allegations of personal involvement insufficient). As such, Manzo's individual-capacity claims against Nurse Bandas lack facial plausibility.

    c. *Negligence Claims are Not Cognizable*

Lastly, Manzo alleges negligence and medical malpractice in diagnosing and treating his retina condition. Deliberate indifference, however, cannot be inferred from mere negligence in diagnosing or treating a medical condition. *Estelle v. Gamble*, 429 U.S. 97, 106; *Gobert v.*

*Caldwell*, 463 F.3d 339, 345-47 (5th Cir. 2006) (recounting that negligent or unsuccessful medical treatment is not actionable).

In sum, Manzo does not plead sufficient facts that could plausibly give rise to a reasonable inference that Dr. Mateware and Nurse Bandas violated his constitutional rights. For this reason and the special factors that counsel against it—including the potential, alternative remedy—*Bivens* does not extend to Manzo's claims in this case.

### III.    LEAVE TO AMEND

Generally "a *pro se* litigant should be offered an opportunity to amend his complaint before it is dismissed." *Brewster v. Dretke*, 587 F.3d 764, 767-68 (5th Cir. 2009). However, the Court is not required to grant leave to amend "if the plaintiff has already pleaded his 'best case.'" *Id.* For the reasons outlined above, Manzo's claims are fatally infirm. In addition, the Court has already given him the opportunity to amend his complaint to plead *Bivens* claims and, thereafter, to supplement it by his *Answers to the Magistrate Judge's Questionnaire*. Thus, the Court concludes Manzo has already pled his best case and granting further leave to amend would be futile and cause needless delay.

### IV.    CONCLUSION

For the foregoing reasons, Manzo's remaining claims should be summarily **DISMISSED WITH PREJUDICE** for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B); 28 U.S.C. § 1915A(b).

This dismissal will count as a "strike" or "prior occasion" within the meaning of 28 U.S.C. § 1915(g).[6]

**SO RECOMMENDED** on December 13, 2021.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of this report and recommendation will be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* am; FED. R. CIV. P. 72(b). An objection must identify the finding or recommendation to which objection is made, the basis for the objection, and the place in the magistrate judge's report and recommendation the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).

---

[6] 28 U.S.C. § 1915(g), commonly known as the "three-strikes" provision, provides: "[i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section, if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."